## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **BRIDGETTE MARQUES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CASE NO.: _____** |
| | ) | |
| **v.** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **FULTON COUNTY SCHOOL** | ) | |
| **DISTRICT; TIMOTHY** | ) | |
| **CORRIGAN, in his individual** | ) | |
| **capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## COMPLAINT

Plaintiff Bridgette Marques ("Ms. Marques" or "Plaintiff") files this complaint for relief and damages against Defendants Fulton County School District, ("FCSD" or "District) and Timothy Corrigan ("Corrigan"), an official of the District, in his individual capacity. Plaintiff relies on the following allegations and causes of action.

## NATURE OF THE ACTION

1.     This action to correct unlawful employment practices by one of Georgia's largest school districts and one of its senior officials arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-3(a), and 42 U.S.C.A. §

1

1983 and § 1981. Ms. Marques, an African-American who served as Principal of State Bridge Crossing Elementary School ("State Bridge Crossing"), alleges (1) an individual capacity claim under § 1983 and § 1981 against Defendant Corrigan, an FCSD Zone Superintendent, for instigating or making false allegations of impropriety against Ms. Marques in retaliation for her opposition to racially discriminatory conduct and (2) retaliation claims against FCSD under Title VII, § 1983, and § 1981.

2.     Plaintiff seeks back pay; lost benefits, including accrued retirement contributions and the costs of health insurance; compensatory damages for mental anguish and emotional distress; punitive damages to the extent allowed by law; and her attorneys' fees and costs of litigation.

## THE PARTIES

3.     Ms. Marques resides in this judicial district and division and was employed by FCSD during the events alleged in this complaint.

4.     FCSD is a local school district created by the laws of the State of Georgia that operates 108 schools in 14 municipalities in Fulton County, outside the city limits of Atlanta. FCSD is subject to suit under Title VII and is liable under § 1983 and § 1981 for discriminatory acts by officials, such as the Superintendent

of the District, to whom it has delegated final policymaking authority with respect to a relevant area or decision.

5.     Defendant Corrigan, who is white, is a former Zone Superintendent of FCSD and served in this position at times relevant to this complaint. He is subject to suit under 42 U.S.C.A. § 1983 and 42 U.S.C.A. § 1981 in his individual capacity.

## SUBJECT MATTER JURISDICTION AND VENUE

6.     Jurisdiction of this court is invoked pursuant to 28 U.S.C.A. § 1331 and § 1343.

7.     Venue is proper in this Court, as the discriminatory acts complained of are alleged to have occurred in this district and division.

## PERSONAL JURISDICTION

8.     FCSD may be served with proper process at its central administrative office at 6201 Powers Ferry Road NW, Atlanta, GA 30339.

9.     Defendant Corrigan may be served with proper process by delivering a copy of the summons and this complaint to him personally at his current place of employment, King's Ridge Christian School, at 2765 Bethany Bend, Alpharetta GA 30004, or by leaving a copy at his dwelling or usual place of abode with

someone of suitable age and discretion who resides there. Fed. R. Civ. Pr. 4 (e)(2)(B).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.    On June 27, 2022, Plaintiff timely filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") under Title VII. *See* Ex. A. She obtained a Right-to-Sue letter on November 9, 2022, and this lawsuit is timely filed prior to the statutory deadline of 90 days. *See* Ex. B.

## FACTUAL ALLEGATIONS

11.    Since 2019, Michael Looney ("Looney") has served as Superintendent of FCSD. Under Georgia law, a superintendent functions as the Chief Executive Officer of the local board of education and is responsible for the enforcement of the various federal, state, and districtwide guidelines that govern the local school district. Ga. Code § 20-2-109 (2010).

12.    FCSD divides its schools into seven geographic districts, which are labeled Zones. A separate superintendent is appointed for each zone and serves as the principal liaison between the District's central administrative office and the leadership of the schools within the zone. A zone superintendent acts as supervisor for the school principals within each zone.

13.    Ms. Marques, an 11-year veteran of FCSD, was promoted to the position of Principal at State Bridge Crossing in the Johns Creek suburb of

Alpharetta, Georgia, at the beginning of the 2015-16 academic year. The school is part of the District's northeast geographic region designated as Zone 6.

14.     FCSD principals are retained on annual contracts that cover the length of an academic year, and they are subject to removal for cause for a variety of factors that constitute "good and efficient cause," including incompetence, insubordination, immoral conduct, and willful neglect of duties. Ga. Code § 20-2-940 (2021).

15.     For six years, under Ms. Marques' leadership, State Bridge Crossing flourished, achieving high rankings in terms of educational achievement data and earning national recognition for exemplary performance.

16.     State Bridge Crossing is a school with a small black student population, less than 10%, and the Johns Creek suburb in which it is located is one of the most affluent enclaves within Fulton County. Ms. Marques is the sole African-American ever to hold a senior administrative position at the school.

17.     Despite Ms. Marques' sustained record of excellence at her school, Cliff Jones, who for the first half of Ms. Marques' tenure as principal was the Zone 6 Superintendent, remarked to her in 2018 that she "might not be a good fit" for State Bridge Crossing solely because she was black. Ms. Marques was jarred by

the comment from Jones, who clarified that he was referencing the persistence of racial bigotry in some elements of the community around the school.

### 2019 investigation of Ms. Marques

18.     In June 2019, Jones' successor as Zone 6 Superintendent, Timothy Corrigan, notified Ms. Marques that he had received a letter signed by multiple teachers at State Bridge Crossing alleging that Ms. Marques had created a hostile and intimidating work environment. In an echo of Jones' remark, Corrigan observed to Ms. Marques that the school might not be the "best fit" for her.

19.     Ms. Marques was never provided even a name-redacted version of the complaint, and she was afforded only limited details during the course of a series of investigative interviews with the human resources ("HR") department, referred to within FCSD as the Talent Relations Office.

20.     The investigators who questioned Ms. Marques reassured her that the claims against her appeared to them to be a classic example of disgruntled employees who were working in concert to oust a principal whom they disliked.

21.     But in August 2019, Corrigan and Chief Talent Officer Ron Wade ("Wade"), the chief HR official in the District, summoned Ms. Marques to FCSD's central administrative office, where Wade informed her that the allegations had been substantiated and that the process of demoting her to a teacher was underway.

At one point, Wade became verbally aggressive, demanding in a raised voice that Ms. Marques "admit what you have done."

22.     The next week, Ms. Marques informed FCSD's new Superintendent, Michael Looney, that her job had been threatened and that she was in distress over her future. Looney professed to be unaware that Ms. Marques had been under investigation but promised her that he would immediately "lean into" the matter.

23.     Looney soon after convened a meeting with Ms. Marques, Wade, and Corrigan to discuss Ms. Marques' status. During the meeting, Ms. Marques brought up the comments from Corrigan's predecessor to the effect that her race had generated backlash from some quarters, and she made it clear that she feared that at least some of the antagonism was connected to racial backlash.

24.     Wade and Corrigan reacted dismissively to Ms. Marques' observations during the meeting, with Wade asserting at one point that "everything was not about race."

25.     In mid-August 2019, the internal investigative report regarding Ms. Marques was issued to FCSD's leadership; the document, contrary to Wade's initial representation, concluded that the evidence was "inconclusive" and that "Ms. Marques did not clearly violate Fulton County School Board policy."

26.    Looney placed Ms. Marques on a 10-day paid administrative leave for failing to provide effective organizational management. But in the fall of 2019, Looney took the additional step of transferring the internal investigations function from Wade's Talent Relations division and establishing the investigations team as a separate internal affairs unit with its own executive director.

27.    Allies of Ms. Marques within the central administrative district made her aware that Corrigan and Wade had openly boasted that Ms. Marques' tenure at State Bridge Crossing was coming to an end and that they expressed their unhappiness that Looney had interceded to save her job after Ms. Marques raised concerns about racial bias at the school.

**Continued conflict between Ms. Marques and Corrigan**

28.    During the subsequent two school years, Ms. Marques did not encounter additional complaints, and she directed her school to two successful benchmarks. First, State Bridge Crossing was the top-ranked school in the District in minimizing learning loss during the COVID-19 pandemic; learning loss is a complex metric that tests whether student proficiency and testing scores declined during the prolonged periods of remote instruction and disruptions in attendance associated with COVID-19.

29.     In 2020, State Bridge Crossing won a coveted designation from the U.S. Department of Education as a Blue Ribbon School, an honor reserved for the nation's most exemplary public schools. Ms. Marques deserved immense credit for her school's achievement, as the selection process for the Blue Ribbon designation examined a three-year period of data coextensive with her tenure as Principal.

30.     Although a Blue Ribbon award represented a signature accomplishment for a school in his geographic zone, Corrigan chose not to attend a series of events celebrating Ms. Marques and State Bridge Crossing. Corrigan went so far as to decline a videotaped interview for a promotional package FCSD created regarding the award.

31.     As a principal in Corrigan's zone, Ms. Marques regularly attended virtual and in-person leadership-level meetings during 2020 and 2021. On multiple occasions, she heard Corrigan make remarks that she viewed as inappropriate or insensitive. They included jokes—days after media coverage of a series of police raids at Asian-owned parlors suspected of prostitution activity—about visiting an Asian massage parlor; a monologue that purported to imitate the speech and dialect patterns of Asians; and a mimicking reference to members of the LGBT community as "girly men."

32.     In late May or early June 2021, after Corrigan's imitation of Asian speech occurred in a leadership meeting, Ms. Marques decided to lodge what she expected would be an anonymous complaint regarding Corrigan's penchant for sexist or ethnic humor with the internal affairs team.

33.     Despite the purported anonymity of the complaint, a senior member of the internal affairs team surprised Ms. Marques by telling her that the team had determined she originated the complaint about Corrigan.

34.     On June 10, Corrigan informed his staff and Zone principals that he would be "out of the office" during the entire work week of June 14. In every other instance that Ms. Marques recalled, Corrigan had provided significant advance notice of absences and was notably transparent about the general nature of the absence, even when the reasons were personal or health-related.

35.     Corrigan did not engage the Zone 6 leadership staff by group email during the entirety of the week of June 14, another uncharacteristic action on Corrigan's part. Ms. Marques recalled that even during leave periods for Corrigan, his routine was to "check in" by email or make some references to his activities during his absence.

36.     As a standard protocol, when FCSD investigates allegations of inappropriate workplace conduct, the subjects are instructed to refrain from contact

with members of their staff or other school personnel while an inquiry is conducted.

37.     The nature of Ms. Marques' allegations inevitably placed Corrigan's comments in the context of his meetings with zone principals. Once Corrigan was apprised of the complaint, it would have been evident to him that the potential source would have been a small circle of individuals that included Ms. Marques, one other African American female, and a cohort of 11 whites, almost all of whom were longtime acquaintances of Corrigan.

**2021 investigation of Ms. Marques**

38.     Ms. Marques took a medical leave for approximately a month, from mid-June to mid-July 2021.

39.     Ms. Marques returned to work in time for the orientation period that preceded the coming school year and the return of students on August 9.

40.     On Thursday, August 5, 2021, Ms. Marques learned from the school nurse that a COVID-positive individual had been in the building a day earlier and that the school was implementing its contact tracing protocols to determine the identities of persons who might have been exposed to the virus. Ms. Marques promptly notified Corrigan.

41.     On the morning of August 6, Ms. Marques and Corrigan texted about the possible exposure. During their exchanges, Ms. Marques noticed an email from the school nurse that had been sent the prior evening notifying her that she had not been in close contact with the COVID-positive individual and that she was cleared to return to work. Ms. Marques informed Corrigan, and soon after, at approximately 8:45 a.m., she reported to work.

42.     On August 10, 2021, Corrigan informed Ms. Marques that the District's central office had received an anonymous tip that she'd reported to work late on August 6 and left prior to the conclusion of the workday. While Corrigan did not share the details in the complaint with Ms. Marques, the document contained a specific claim that Ms. Marques did not arrive at work until 8:45 a.m. and left at 2:30 p.m. and made additional allegations that Ms. Marques "habitually arrived on the job late and departed early."

43.     Ms. Marques was promptly placed on a paid administrative leave, effective August 11.

44.     During the next 20 days, FCSD's internal investigations team conducted an inquiry into Ms. Marques' attendance habits during the summer 2021 time frame.

45.     In the course of the investigation, Corrigan provided facts that were inaccurate or misleading regarding Ms. Marques' comings and goings on August 6. Based on the contents of the ultimate report, Corrigan appears to have claimed to investigators that Ms. Marques misrepresented her arrival time to him as 6:20 a.m., when footage revealed that she entered the building at 8:43.

46.     Corrigan knew from his own text exchanges that his description of Ms. Marques' purported dishonesty was itself false and that at 7:57 a.m. they were engaged in a discussion of whether she would report to work or await a positive test result, and that shortly after 8:00 a.m., she disclosed by text that she had just noticed the email clearing her to return to work.

47.     Corrigan made additional misrepresentations to investigators regarding the second area of inquiry, which focused on whether Ms. Marques failed to work an eight-hour day during the summer of 2021.

48.     Specifically, Corrigan told investigators that he had reviewed video logs of Ms. Marques' entries and departures for each day from the date she returned from medical leave, on July 19 to August 11, and that on nine of the sixteen days, she failed to work eight hours. Corrigan asserted to investigators that while Zone 6 principals were afforded flexibility to adjust the actual times they

worked, they were instructed to maintain a full eight-hour schedule during the summer.

49.    Corrigan knew the information he shared regarding the summer schedule was misleading. The actual content of his written instructions to principals was more nuanced; in an email on May 14, Corrigan stated that "there is flexibility on the 8 hours as long as schools work within the established times in board policies GCRC and GBRC."  (hyperlinks in original.)

50.    The acronyms Corrigan links to in his May 14 email are the District's policy guidelines regarding schedules for exempt and nonexempt salaried employees. The exempt employee provision that governs administrators like Ms. Marques—which Corrigan describes by their reference code, GBRC—explicitly states that "[d]uties which shall count toward fulfillment of the minimum workday requirement" include tasks such as "preparation" and "responsibilities related to school activities in the community."

51.    Corrigan knew, and FCSD's investigators knew or could have learned through the click of a hyperlink, that the May 14 email does not in any manner direct that a school principal be present on school premises for a full eight-hour day. As a result, Corrigan's claims that Ms. Marques' attendance patterns in the summer of 2021 violated his directive or school policies were simply false.

52.     Furthermore, it was widely known in the central office that the established practice in the District was that principals routinely did not work in the office for eight hours a day during the summer break.

53.     It is unusual that Corrigan inserted himself into the gathering of facts regarding Ms. Marques' attendance to the point that he compiled and reviewed video footage of her movements prior to sharing his findings with investigators. The usual procedure at FCSD is that senior administrators confine their participation in investigations to formal interviews.

54.     During the investigation itself, Ms. Marques was pointedly not questioned about the days prior to August 6 on which she allegedly failed to work a full workday. Had she been informed of the full scope of FCSD's investigation, Ms. Marques could have rebutted the claims regarding her attendance history either by providing information about the full array of activities she engaged in on each day in question or offering her interpretation of Corrigan's reference in his summer schedule email to "flexibility on the 8 hours."

55.     In contravention of FCSD guidelines and protocols, FCSD never performed the basic step of informing Ms. Marques of the specifics of its investigative findings. In lieu of being provided with a written report, Ms. Marques was informed by Wade in a phone call on or about September 2, 2021, that the

allegations against her had been "substantiated" and that, in his phrasing, "the District" had decided to terminate her as an employee.

56.     When Ms. Marques sought to inquire by email and in phone exchanges with Wade the substance of the findings, she was told only that she had the right to contest the findings before the school board in an administrative hearing. In multiple conversations, Wade instructed Ms. Marques that as an alternative to termination, she could resign upon the completion of the semester but she would remain on a prolonged suspension until her departure.

57.     On September 12, 2021, Ms. Marques informed Looney and Wade by email that she would not contest the termination decision and would opt to resign effective December 31, 2021. Based on FCSD's investigative findings, Ms. Marques remained on an extended five-month administrative leave that prevented her from performing her duties or setting foot on the premises of State Bridge Crossing.

58.     The duration of Ms. Marques' extended leave based on Corrigan's allegations included dates up to and including December 29, 2021, within 180 days prior to the filing of Ms. Marques' EEOC charge on June 27, 2022.

59.     Under Georgia law, the superintendent of a school district is delegated authority to recommend terminating  the contracts of personnel, including

administrators, and to relieve from duty personnel pending a contest hearing before the board or a designated tribunal of the board. Ga. Code § 20–2-940 (2021).

60.    In the event an administrator declines to contest a recommendation of termination, as did Ms. Marques, the superintendent is the effective final decision-maker regarding personnel decisions.

61.    Under FCSD policies, the chief talent officer reviews the results of internal investigations and advises the superintendent regarding the ultimate personnel decision.

62.    In the case of Ms. Marques, Superintendent Looney and his principal deputy for personnel matters, Chief Talent Officer Ron Wade, neglected to conduct their own independent review of the investigation of her alleged attendance infractions. As a result, they ratified the allegations of Zone Superintendent Corrigan, whose actions are plausibly explained by retaliatory animus.

63.    The FCSD investigation of Ms. Marques was deficient in the most fundamental manner. Investigators never examined text messages between Ms. Marques and Corrigan on the morning of August 6, 2021, which would have undermined Corrigan's claim that Ms. Marques was deceptive about the timing of her arrival at work that day.

64.     FCSD's investigator failed to obtain or review readily available information regarding the obligations of exempt workers or the specifics of Corrigan's instructions regarding summer work hours for in-school personnel and did not interview Ms. Marques regarding key aspects of the findings.

## COUNT I

**(Retaliation under 42 U.S.C.A. § 1981 and 42 U.S.C.A. § 1983 (against Fulton County School District))**

65.     Plaintiff incorporates by reference the preceding paragraphs in this complaint as if set forth fully herein.

66.     42 U.S.C.A. § 1981 prohibits retaliation for complaining of intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts.

67.     Plaintiff's claim against the Fulton County School District under 42 U.S.C.A. § 1981 is brought pursuant to 42 U.S.C.A. § 1983 and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

68.     Defendant FCSD is liable for an act of unlawful retaliation based on race discrimination by an official to whom it has delegated final decision-making authority in the area of the challenged employment action or decision.

69.     Under Georgia law and the policies of the District, the Superintendent of FCSD is delegated decision-making authority to relieve personnel, including

school administrators, from employment. In the absence of the employee's exercise of her right to contest an employment action before the school board, the Superintendent's termination decision is effective and does not require approval by the board.

70.    Plaintiff engaged in protected activity under § 1981 by (1) reporting to the Superintendent of the District her view that personnel complaints in 2019 during her tenure as Principal of State Bridge Crossing Elementary School were based on racial animus and (2) in May 2021, initiating an internal complaint that the Associate Superintendent made offensive remarks, including racially and ethnically derogatory comments.

71.    The Superintendent of the District ratified the retaliatory acts of the Associate Superintendent Timothy Corrigan i.e, Corrigan's instigation of false and misleading claims regarding Plaintiff's attendance record in the summer of 2021, by failing to review or independently investigate Corrigan's allegations, thereby giving effect to Corrigan's retaliatory animus.

72.    As a result of the unlawful retaliatory conduct that is imputed to the District's senior policymaking official with respect to termination recommendations, Plaintiff's constitutional right to equal protection under the law was violated.

73.     Based on the unlawful and unconstitutional conduct Plaintiff has suffered, she has incurred monetary damages, including but not limited to back pay and the loss of benefits, and noneconomic damages, including emotional distress, humiliation, embarrassment, and mental anguish.

## COUNT II

### (Retaliation under 42 U.S.C.A. § 1981 and 42 U.S.C.A. § 1983 (against Defendant Timothy Corrigan in his individual capacity))

74.     Plaintiff incorporates by reference the preceding paragraphs in this complaint as if set forth fully herein.

75.     42 U.S.C.A. § 1981 prohibits retaliation for complaining of intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts.

76.     Plaintiff's claim against Defendant Corrigan under 42 U.S.C.A. § 1981 is brought pursuant to 42 U.S.C.A. § 1983 and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

77.     Defendant Corrigan is sued in his individual capacity as an officer of the Fulton County School District.

78.     Plaintiff engaged in protected activity under § 1981 by (1) reporting to the Superintendent of the District her view that personnel complaints in 2019 during her tenure as Principal of State Bridge Crossing Elementary School were

based on racial animus and (2) in May 2021, initiating an internal complaint that Corrigan made offensive remarks, including racially and ethnically derogatory comments.

79.   Defendant Corrigan retaliated against Plaintiff by instigating and making false and misleading claims regarding Plaintiff's attendance record in the summer of 2021.

80.   Defendant Corrigan, while performing a discretionary function, violated clearly established statutory and constitutional law, i.e., Plaintiff's right to be free from retaliation based on her opposition to racially discriminatory conduct.

81.   As a result of Defendant Corrigan's unlawful retaliatory conduct, Plaintiff suffered monetary damages, including but not limited to back pay and the loss of benefits, and noneconomic damages, including emotional distress, humiliation, embarrassment, and mental anguish.

82.   Corrigan is a higher-level management official employed by Defendant who acted willfully with malice or reckless indifference to Plaintiff's federally protected rights, and Plaintiff is therefore entitled to recover punitive damages.

## COUNT III

**(Retaliatory Hostile Environment under Title VII, 42 U.S.C.A. §
2000e-3(a) against defendant Fulton County School District))**

83.    Plaintiff incorporates by reference the preceding paragraphs in this
complaint as if set forth fully herein.

84.    Plaintiff engaged in protected activity under Title VII in that she
lodged an internal complaint concerning discriminatory remarks by Zone 6
Superintendent Corrigan, including jokes about visiting a Asian massage parlor
days after media coverage of a series of police raids at Asian owned parlors
suspected of prostitution activity; a monologue that purported to imitate the speech
and dialect patterns of Asians; and an insulting reference to the LGBT community
during a discussion about "drag queens."

85.    Under Title VII, an employer is liable for acts of its agents or officers
that establish a hostile environment based on retaliation.

86.    The standard for a retaliation-based hostile work environment claim
requires that the employer's actions "might have dissuaded a reasonable worker"
making a complaint of discrimination.

87.    Subsequent to her reporting of discriminatory conduct, Plaintiff was
subjected to continuous examples of retaliatory conduct that might have dissuaded

a reasonable employee from making a complaint of discrimination. These examples include but are not limited to misrepresentations by an FCSD official regarding her attendance records, a one-sided investigation in which Plaintiff was denied a meaningful opportunity to rebut allegations, and a lengthy suspension based on false allegations by a District official.

88.    As a result of Defendant's unlawful retaliatory conduct, Plaintiff suffered monetary damages, including but not limited to back pay and the loss of benefits, and noneconomic damages, including emotional distress, humiliation, embarrassment, and mental anguish.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff demands a trial by jury and that the following relief be granted:

A. Back pay; front pay; lost benefits, including the costs of lost benefits including health insurance; accrued sick leave; and accumulated retirement contributions.

B. Compensatory and punitive damages to the extent allowed by law.

C. Attorneys' fees and costs of litigation.

D. Prejudgment and post-judgment interest at the highest lawful rate.

E.  Such other equitable and monetary relief as the Court deems just and

proper, including reinstatement to her prior position.

Respectfully submitted on the 18th day of January 2023.

**HKM Employment Attorneys LLP**
*s/Artur Davis*
Artur Davis[1]
ASB-3672-D56A
2024 3rd Ave. North, Suite 307
Birmingham, AL 35203
Direct: 205-881-0935
adavis@hkm.com
Jermaine "Jay" Walker
GA Bar No. 142044
3355 Lenox Rd. NE, Suite 705
Atlanta, GA 30326
Direct: 404-301-4020
jwalker@hkm.com

Attorneys for Plaintiff Bridgette Marques

---

[1]Artur Davis will promptly file for admission *pro hac vice* as an attorney of record
in this action. Mr. Davis is licensed in the state of Alabama and the District of
Columbia.